# In the United States Court of Federal Claims

No. 15-1575

(Filed: December 7, 2022)

```
*************************************
BRYNDON FISHER,                    *
                                   *
           Plaintiff,              *
                                   *     Class Certification; RCFC 23(a);
      v.                           *     RCFC 23(b); Class Action;
                                   *     Predominance; Superiority.
THE UNITED STATES,                 *
                                   *
           Defendant.              *
*************************************
```

*Amber L. Schubert*, Schubert, Jonckheer & Kolbe, LLP, San Francisco, CA, counsel for Plaintiff.

*Meen G. Oh*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant.

## OPINION AND ORDER

**DIETZ, Judge.**

      Plaintiff, Bryndon Fisher, brings a putative class action against the United States alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and illegal exaction. Mr. Fisher claims that the government overcharged users of the Public Access to Court Electronic Records ("PACER") system for accessing federal court dockets online because of a systemic flaw in PACER's billing code. Before the Court is Mr. Fisher's motion for class certification under Rule 23 of the Rules of the United States Court of Federal Claims ("RCFC"). Because the Court finds that Mr. Fisher has failed to satisfy the predominance and superiority requirements of RCFC 23(b), his motion for class certification is **DENIED.**

## I. BACKGROUND

      PACER is an online portal that provides public access to court filings and case activity "at more than 200 federal courts." *About Us*, https://pacer.uscourts.gov/about-us (last visited Dec. 7, 2022). "[PACER] is funded entirely through user fees set by the Judicial Conference of the United States . . . [and] . . . published in the Electronic Public Access Fee Schedule." *Id.* The PACER search engine retrieves information such as the parties to a case, the parties' counsel, terminated parties, notices of electronic filing, and more, and provides this information in the form of a customized docket report. Def.'s Resp. to Pl.'s Mot. for Class Certification [ECF 107] at 6.[1] The information retrieved for each user is determined by their selection of up to 12 unique

---

[1] All page numbers in the parties' briefings refer to the page number generated by the CM/ECF system.

search variations. *Id.* PACER provides that users are charged for these docket reports based upon the amount of "bytes extracted" when running a particular search. *Frequently Asked Questions,* https://pacer.uscourts.gov/help/faqs/can-users-determine-how-large-document-it-accessed-pacer-and-being-charged (last visited Dec. 6, 2022).

Mr. Fisher opened a PACER account in late 2013. Pl.'s App. to Mot. for Class Certification [ECF 94-2] at 189. Over the following year, Mr. Fisher requested access to 164 court dockets. *Id.* at 329. He contends that, due to a systemic flaw in the PACER billing code, he was overcharged for his access to these docket reports by approximately thirty dollars. *Id.* at 340. Mr. Fisher asserts that the PACER billing system is inconsistent with the terms of the PACER User Manual because, in its calculation of bytes extracted, it charges users for the number of bytes extracted immediately after a user runs a search, rather than the number of bytes contained in the final data set provided to users after PACER has truncated specific portions of the data. *Id.* at 341.

On December 4, 2020, Mr. Fisher filed the motion presently before the Court. Pl.'s Mot. for Class Certification [ECF 94]. Mr. Fisher seeks class certification for his claims on behalf of "[a]ll PACER users who, from December 28, 2009 through class certification, accessed a U.S. District Court, Bankruptcy Court, or the U.S. Court of Federal Claims and were charged for at least one docket report." *Id.* at 1. Mr. Fisher's motion is fully briefed, and the Court heard oral argument on November 2, 2022. *See* Order [ECF 129].

## II.   LEGAL STANDARD

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 348, (2011) (quotations omitted). "[T]he efficiency and economy of litigation . . . is a principal purpose of [class action] procedure." *Am. Pipe & Const. Co. v. Utah,* 414 U.S. 538, 553 (1974); *see also Bright v. United States*, 603 F.3d 1273, 1288 (Fed. Cir. 2010) (applying this standard). RCFC 23 governs class action suits brought in the United States Court of Federal Claims. RCFC 23 provides as follows:

> (a)   **Prerequisites.** One or more members of a class may sue as representative parties on behalf of all members only if:
> (1)   the class is so numerous that joinder of all members is impracticable;
> (2)   there are questions of law or fact common to the class;
> (3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4)   the representative parties will fairly and adequately protect the interests of the class.
>
> (b)   **Class Actions Maintainable.** A class action may be maintained if RCFC 23(a) is satisfied and if:
> (1)   [not used];
> (2)   the United States has acted or refused to act on grounds generally applicable to the class; and

>   > (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>   >   > (A) the class members' interests in individually controlling the prosecution of separate actions;
>   >   > (B) the extent and nature of any litigation concerning the controversy already begun by class members;
>   >   > (C) [not used]; and
>   >   > (D) the likely difficulties in managing a class action.

RCFC 23(a)-(b). The requirements of RCFC 23(a) and RCFC 23(b) are in the conjunctive; thus, a failure to satisfy any one of them is fatal to class certification. *Horvath v. United States,* 149 Fed. Cl. 735, 745 (2020).[2] The party seeking certification bears the burden of establishing that the requirements of RCFC 23 have been met by a preponderance of the evidence. *See Dukes*, 564 U.S. at 350; *see also Bell v. United States,* 123 Fed. Cl. 390, 395 (2015). "Class certification is at the discretion of the trial court." *Bell*, 123 Fed. Cl. at 395 (collecting cases); *see also Fink v. Nat'l Sav. & Tr. Co.,* 772 F.2d 951, 960 (D.C. Cir. 1985).[3]

## III. DISCUSSION

Mr. Fisher's case turns on whether RCFC 23(b)'s requirements of predominance and superiority are met. The government does not dispute that the requirements of numerosity, commonality, typicality, and adequacy under RCFC 23(a) are met in this case. [ECF 107] at 9. Upon review, the Court finds that Mr. Fisher satisfies these requirements. The government contends, however, that Mr. Fisher has not met the burden of establishing predominance and superiority in this case. *Id.* As explained below, the Court finds that Mr. Fisher has not demonstrated that the questions of law or fact common to the members of his proposed class predominate over questions affecting only individual members because the individualized questions of harm and damages overwhelm the common questions in this case. Further, the Court also finds that Mr. Fisher has not established that a class action would be superior to other available methods for adjudication because the likely difficulties in managing this case as a class

---

[2] Courts vary in their approach to class certification under RCFC 23. Some courts analyze the requirements of 23(a) and 23(b) concurrently, considering the predominance requirement as part of 23(a)'s commonality requirement. *See, e.g., Oztimurlenk,* No. 19-1715C, 2022 WL 12240522 at *5 (defining the requirements of RCFC 23). Other courts analyze the 23(a) and 23(b) requirements separately, as the Court does here. *See, e.g., Fisher*, 69 Fed. Cl. at 198-206 (applying RCFC 23). The Court has wide discretion in deciding whether the requirements of RCFC have been satisfied, so long as it conducts a rigorous analysis of the RCFC 23 requirements. *See Horvath,* 149 Fed. Cl. at 743.

[3] RCFC 23 "is modeled largely on the comparable [Federal Rule of Civil Procedure ("FRCP") 23]." Rule Committee Notes on RCFC 23, 2002 Rev. Although there are some notable differences between RCFC 23 and FRCP 23—among these, RCFC 23's contemplation of only opt-in classes and the Court of Federal Claim's inability to accommodate declaratory and injunctive relief—the Court will consider other federal courts' application of FRCP 23 persuasive when that reasoning is unaffected by these differences. *See Horvath,* 149 Fed. Cl. at n.4 (2020).

action due to the individualized questions of harm and damages far outweigh the other RCFC 23(b)(3) factors.

### A. Rule 23(b)(3) Predominance of Common Issues of Fact or Law

Under RCFC 23(b)(3), a class action may be maintained only if the United States has acted or refused to act on grounds generally applicable to the class, and the court finds that the questions of law or fact common to the class members predominate over any questions affecting only individual members. "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "It is not sufficient that common questions merely exist, as is true for purposes of Rule 23(a)(2)." *Fisher v. United States*, 69 Fed. Cl. 193, 201 (2006). The predominance requirement "is far more demanding" than RCFC 23(a)'s commonality criterion. *Amchem Prods., Inc.* at 623-24. Unlike RCFC 23(a)(2)'s lesser requirement of a common answer to a common question, "RCFC 23(b)(3) requires the [c]ourt to look across the full set of material questions the proposed class action raises to determine whether the common issues predominate." *Oztimurlenk v. United States,* No. 19-1715C, 2022 WL 12240522 at *11 (Fed. Cl. Oct. 20, 2022). "Thus, pursuant to RCFC 23(b)(3), the Court must 'find[] that the questions of law or fact *common* to class members *predominate* over any questions affecting individual members.'" *Id.* (emphasis in original).

In performing a predominance analysis, the Court must "give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member[.]" *Id.* (quotation marks omitted). Common issues predominate only if the issues that can be resolved by generalized proof "are more substantial than the issues subject only to individualized proof." *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020) (citing *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002)). "[C]ertification is inappropriate when 'after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individualized claims.'" *Oztimurlenk,* 2022 WL 12240522, at *12 (quoting *Sellers v. Rushmore Loan Mgmt. Servs., LLC*, 941 F.3d 1031, 1040 (11th Cir. 2019)).

Mr. Fisher proposes a class of "[a]ll PACER users who, from December 28, 2009 through class certification, accessed a U.S. District Court, U.S. Bankruptcy Court, or the U.S. Court of Federal Claims and were charged for at least one docket report." Pl.'s Initial Br. in Supp. of Mot. for Class Certification [ECF 94-1] at 1. The government argues that this class, as defined, includes almost four million PACER users who accessed docket reports across 190 federal courts and who may, *or may not*, have been overcharged by the alleged systemic billing flaw as a result of the specific search they ran. [ECF 104] at 13. The government maintains that whether each class member was harmed by the alleged flaw turns on, among other things, an analysis of each user's selection of up to 12 distinct search criteria options, the level of access granted to each user, each court's customizations of the PACER system, and each user's saved default search criteria, if applicable. *Id*. at 8-10. As a result, the government asserts that Mr.

Fisher has not satisfied the predominance requirement because the number of individual inquiries necessary to resolve the questions of harm and damages overwhelm any common questions and are not accounted for by Mr. Fisher's proposed methodologies. *See* [ECF 107] at 10-11.

Mr. Fisher frames this issue as nothing more than a mere damages calculation, citing numerous cases in support of his proposition that individual damages calculations alone will not preclude class certification, and that the overall question of liability is more substantial than the individualized calculation of damages. *See* [ECF 94-1] at 17. He asserts that liability is resolved classwide by answering the "overarching question in this litigation—whether the Government overcharged PACER users for accessing docket reports," which he believes can be established through generalized proof applicable to all class members. *Id*.

Mr. Fisher's expert, Dr. George Edwards, advanced two methods for calculating the alleged excess charges for docket reports. *See* [ECF 94-2] at 43-46. Method 1 is shown in the table below.

| **Method 1** |
|---|
| 1. For each docket report in the list of PACER charges that was run in a quarter in which the PACER user exceeded the threshold for having all charges waived[4]:<br>    a. Obtain a copy of the docket report, using the date and/or document number intervals indicated in the listing of charges and all other report options set to their default values. If no date or document number value was specified in the "to" field, set the "to" field as the date the docket report was originally retrieved.<br>    b. Count the number of bytes in the text of the docket report starting from the court name through the last docket entry. Do not include the PACER website headers shown at the top of the page or the transaction receipt that is displayed at the bottom of the page in the byte count.<br>    c. Compute the expected cost of the docket report as the minimum of either 3 dollars or the quantity given by the quotient of the byte count divided by 4320 rounded up to the nearest integer and multiplied by 10 cents.<br>    d. Subtract the expected cost of the docket report from the actual cost of that docket report as recorded in the listing of charges to compute the excess charge for the docket report.<br>2. Sum together the excess charges for all docket reports for a user to compute the total estimated excess charges for the user.<br>3. Sum together the excess charges for all users to compute the total estimated excess charges for all users during the relevant time period. |

[ECF 94-2] at 43. Dr. Edwards states that this method would require "retrieving every docket report contained in the listing of PACER charges" and thus "a programmatic means for retrieving, storing, and processing docket reports in an automated fashion." *Id*. at 44. He then

---

[4] PACER waives fees for users who access $30 or less in charges per quarter. *See Billing*, available at https://pacer.uscourts.gov/my-account-billing/billing/options-access-records-if-you-cannot-afford-pacer-fees (last visited Dec. 5, 2022).

states that "it would not be difficult for [him] or another qualified expert to create a computer program to perform" this method. *Id.*

Method 2 is shown in the table below.

| Method 2 |
|---|
| 1. Divide the set of all docket reports in the listing of PACER charges into distinct groups based on docket report metadata that is contained in the associated record of the docket report charge. For example, the docket reports could be divided into distinct groups using any combination of time, date, case type, court, user, and/or number of pages.
2. For each group:
    a. Select an appropriately sized, representative sample of docket reports from the group.
    b. Compute the excess charge for each docket report in the sample using Method 1.
    c. Compute the equation for a trend line that to the greatest extent possible describes the relationship between the excess charge for a docket report in the group and any combination of docket report metadata that is contained in the associated record of the docket report charge, such as the time, date, case type, court, user, and/or number of pages.
3. Estimate the total excess charges for each docket report in the listing of PACER charges using the equation determined for that docket report's group.
4. Sum together the excess charges for all docket reports for a user to compute the total estimated excess charges for the user.
5. Sum together the excess charges for all users to compute the total estimated excess charges for all users during the relevant time period. |

[ECF 94-2] at 45. Dr. Edwards opines that Method 2 would also "be technically feasible to implement and perform" and that "it would not be difficult or time-consuming for [him] (or another qualified expert) to construct [the multiple] computer programs" necessary for its implementation. *Id.* at 45-46.

The government's experts contend that both proposed methods are flawed because they rely on using "default values" to recreate searches and propose no way to account for all the variations between each user's searches due to the many customizable options presented when running a PACER search. *See generally* Def.'s App. to Def.'s Resp. [ECF 107-1]. Further, the government's experts conclude that Mr. Fisher fails to demonstrate the feasibility of implementing his expert's methodologies, making only speculative assurances of what the methodologies *could* or *would* do. *See id.*

Mr. Fisher filed a reply,[5] wherein he argued that the government misunderstood how Method 1 would work regarding the use of "default options." Pl.'s Reply Br. in Supp. of Mot. for

---

[5] The government contends that Mr. Fisher's reply contains portions which exceed the permissible scope for expert rebuttal, and on February 25, 2022, the parties filed supplemental briefing on this issue. *See* Def.'s Suppl. Br. [ECFs 123], Pl.'s Suppl. Br. [124]. The Court need not address whether the disputed portions exceed the permissible scope, as it finds this inquiry immaterial to its conclusion denying class certification. First, Mr. Fisher maintains that, even

Class Certification [ECF 111] at 9. Mr. Fisher cited Dr. Edwards' deposition for the proposition that the method "would use the options the *user used* when retrieving the docket report," and not default options. *Id.* Additionally, Mr. Fisher argued that implementation of the methodology *is* feasible by introducing over 300 pages of brand-new computer coding. *See generally* Pl.'s App. to Pl.'s Reply [ECF 111-1]. Further, Mr. Fisher filed a notice of supplemental authority, citing to *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022), and arguing that the methods presented could "winnow out any uninjured class members at the damages phase of the litigation." [ECF 125] at 2.

The Court is not convinced that Mr. Fisher's proposed methodologies are capable of establishing classwide harm and damages. Even if Mr. Fisher's overarching question of whether the government overcharged PACER users for accessing docket reports was answered in the affirmative, Mr. Fisher's proposed methodologies still fall far short of demonstrating that they are capable of determining classwide harm or damages, leaving a significant number of individualized questions to be resolved. *See In re Rail Freight Fuel Surcharge Antitrust Litig.- MDL No. 1869,* 725 F.3d 244, 253 ("When a case turns on individualized proof of injury, separate trials are in order."); *see also Amgen Inc., v. Connecticut Ret. Plans & Tr. Funds,* 568 U.S. 455, 467-68 (2013) (noting that the requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class."); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (holding that predominance was not met where model failed to establish that damages were capable of measurement on a classwide basis). In his opening report, Dr. Edwards makes bare, speculative assurances of what his proposed methods *could* do, but fails to demonstrate the feasibility of such methods or to account for the individualized differences presented by the customizable options of the PACER search engine. *See* [ECF 94-2] at 43, 45-46. In his reply, he introduces completely new coding and methodology, untested by the government's experts, to support his conclusion that uninjured class members can be easily "winnowed out" and that his proposed methodologies are capable of demonstrating classwide harm and damages. *See generally* [ECF 111-1]. This reply once again fails to account for the individualized differences presented by the customizable options of the PACER search engine, summarily responding to the government by stating without explanation that "[sealed dockets] can be easily excluded," [ECF 111] at 25, and that "charges for [dockets with partial or indeterminable date or document intervals] may be estimated using the available records with complete intervals," [ECF 111-1] at 24. In what appears to be Mr. Fisher's only attempt at directly addressing concerns about PACER's customizable options, he proffers that "Method 1 can simply assume the value that results in the lowest estimated excess charge, which ensures the estimate is a lower-bound than the actual excess charge." *Id.* at 27. It is precisely this highly subjective and speculative methodology that "falls far short of establishing that damages are capable of measurement on a classwide basis." *Comcast Corp.,* 569 U.S. at 34.

---

if the disputed portions were stricken, the requirements for class certification are met. [ECF 123] at 6. Second, the Court concludes that, even if the disputed portions were considered, Mr. Fisher still fails to demonstrate that his proposed methods are capable of determining classwide harm and damages because individual questions still predominate over common ones.

The Ninth Circuit's decision in *Olean Wholesale* demonstrates the inadequacy of Mr. Fisher's proposed methodologies.[6] *See* 31 F.4th 651. In that case, a group of direct and indirect tuna purchasers sought to certify a putative class action against tuna suppliers alleging a price-fixing antitrust conspiracy. *Id.* The main issue on appeal was whether plaintiff's statistical regression model, along with other expert evidence, was capable of showing that the alleged price-fixing conspiracy caused class-wide antitrust impact—an express element of an antitrust claim, thereby satisfying the predominance requirement of FRCP 23(b). *Id.* at 661.

To demonstrate class-wide impact, plaintiff's expert, Dr. Russell Mangum, first performed a pricing correlation test, which demonstrated that the prices of the tuna suppliers' products moved up or down together regardless of product or customer type. *Olean,* 31 F.4th at 671. To further explore the antitrust impact and account for other variables that could affect prices, Dr. Mangum constructed a statistical model using a multiple regression analysis. *Id.* This model controlled for the effect of numerous variables identified by Dr. Mangum and showed that purchasers paid 10.28 percent more for tuna during the conspiracy period, further confirming Dr. Mangum's theory that the tuna suppliers' collusion had a classwide effect. *Id.* Dr. Mangum then performed several "robustness checks" to confirm the reliability of his regression model, changing it to evaluate the overcharge specific to each defendant, product with different characteristics, and customer type. *Id.* at 672. The Ninth Circuit concluded:

> Finally, Dr. Mangum used the output of the pooled regression model to predict the but-for prices (i.e., what the price of tuna during the conspiracy period would have been without the overcharge caused by the conspiracy), and compared these predicted but-for prices to the actual prices paid by the [] class. This comparison showed that 94.5 percent of the purchasers had at least one purchase above the predicted but-for price, which again provided further evidence that the conspiracy had a common impact on all or nearly all the members of the [] class. Dr. Mangum therefore concluded that his aggregated regression model provided econometric evidence that the conspiracy resulted in higher prices paid by all or nearly all [class members]. According to Dr. Mangum, the results were strong evidence of common, class-wide antitrust impact.

*Id.* The methodologies advanced by Mr. Fisher's expert in this case are clearly less robust than those applied by Dr. Mangum in *Olean Wholesale.* Whereas Dr. Mangum constructed, applied,

---

[6] Mr. Fisher cites this case in support of his argument that RCFC 23 does not preclude certification of a class that potentially includes more than a *de minimis* number of uninjured class members. *See* [ECF 125]. The Court does not opine on whether a specified percentage of uninjured plaintiffs is fatal to class certification. *See Olean*, 31 F.4th at 691-92 (Lee, J., dissenting) (noting the circuit split created by the majority's rejection of a *de minimis* rule). However, the Court concludes that predominance is not satisfied where individualized questions of harm or damages *overwhelm* the common questions, thus precluding class certification. "Rule 23(b)(3)[] [] requires [] that the district court determine after rigorous analysis whether the common question predominates over any individual questions, including individualized questions about injury or entitlement to damages." *Olean*, 31 F.4th at 669 (citing Fed. R. Civ. P. 23(b)(3)).

and rigorously tested his proposed methodology prior to class certification, Mr. Fisher's expert did not so much as attempt to implement his methodologies until prompted by the government's experts to do so. The newly constructed and untested methodologies presented by Mr. Fisher are insufficient to demonstrate that they are capable of determining classwide harm or damages.

The United States District Court for the Southern District of Florida's analysis in a factually analogous case, *Theodore D'Apuzzo, P.A. v. United States*, is also informative. 2018 WL 2688760 (S.D. Fla. Apr. 13, 2018). In *D'Apuzzo*, a representative sought to certify a putative class action of similarly defined PACER users for the same underlying claims asserted by Mr. Fisher—breach of contract, breach of the implied covenant of good faith and fair dealing, and illegal exaction. *Id.* at 1. The class was defined as "all PACER users who, between November 22, 2010 and November 22, 2016, paid to access a document constituting a judicial opinion." *Id.* at 2. The court found that, where "the official guidance with the respect to the definition of 'written opinion' [was] inherently subjective," the claims were not subject to determination with generalized proof. *Id.* at 3. Further, the court found that, because determining the proper definition of written opinion was central to the "[p]laintiff's causes of action[] and would require individualized proof," the case could not be maintained as a class action. *Id.* The District Court concluded its predominance inquiry by stating that "individualized issues would also predominate over common issues in the determination of damages," as "review of each PACER user's account would be required to determine which potential class members in fact improperly paid for an opinion on PACER." *Id.*

The court's reasoning in *D'Apuzzo* can be squarely applied here, where the search criteria used by each class member in Mr. Fisher's proposed class is also "inherently subjective" and damages are central to proving the underlying causes of action.[7] Additionally, under Mr. Fisher's proposed methodologies, a review of each PACER user's account would be required to determine who was overcharged, and by how much, resulting in highly individualized questions of harm and damages that predominate over common questions. As such, the Court finds that RCFC 23's predominance requirement is not satisfied.

### B. Rule 23(b) Superiority of Class Action

The second prong of RCFC 23(b)(3) provides that a class action is properly maintained only after the court finds "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." RCFC 23(b)(3). "The superiority requirement is met where 'a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Fisher,* 69 Fed. Cl. at 205 (citing *Barnes,* 68 Fed. Cl. at 499). "When reviewing motions to certify a class, this court has previously utilized a cost-benefit analysis, weighing foreseeable manageability or fairness problems against 'the benefits to the system and the individual members likely to be derived from maintaining such an action.'"

---

[7] Establishing that damages are capable of measurement on a classwide basis is even more necessary here, where damages are an express element of Mr. Fisher's underlying claims for breach of contract and illegal exaction. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action.").

*Curry v. United States,* 81 Fed. Cl. 328, 337 (quoting *Barnes*, 68 Fed. Cl. at 499). RCFC 23(b)(3) provides a list of non-exhaustive factors to be considered in determining whether the superiority requirement has been met, including: "the class members' interests in individually controlling the prosecution of separate actions;" "the extent and nature of any litigation concerning the controversy already begun by class members;" and "the likely difficulties in managing a class action."

The Court finds that this final factor—the likely difficulties in managing a class action—far outweighs the other factors provided by RCFC 23(b)(3), and thus precludes a finding of superiority in this case. "A class action must represent the best 'available method[] for the fair and efficient adjudication of the controversy." *Fisher*, 69 Fed. Cl. at 205 (quoting FRCP 23(b)(3)). "It is pursuant to this requirement that the court should address the difficulties likely to be encountered in the management of a class action." *Id.* at 205-06 (citing *Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 194 (3rd Cir. 2001). Manageability "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).

As discussed above, Mr. Fisher's proposed class and methodologies require highly individualized determinations of both harm and damages. The need to make these determinations severely hinders the manageability of this case as a class action. If the Court were to certify the proposed class as to all issues in this litigation, it would nevertheless encounter significant difficulties trying to determine individual class members' entitlement to refunds due to the customizable search options provided by PACER and the limited search records that it maintains. For this reason, a class action would fail to achieve economies of time, effort, and expense.

Mr. Fisher argues that the proposed class is manageable because the government "has within its possession the information needed to identify and notify each class member." [ECF 94-1] at 20. In support of his argument, he cites to *National Veterans Legal Services Program v. United States*, 235 F. Supp. 3d 32, 36 (D.D.C. 2017), where the D.C. District Court approved of a plan that used email to provide notice to a class of PACER users. *Id.* However, that case is easily distinguished from the case at hand, as it involved a challenge to the PACER fee schedule under which *every* PACER user in the proposed class was harmed. *See id.* Here, Mr. Fisher's proposed class contains PACER users who may, or may not, have been harmed by the alleged billing flaw. Thus, an email notice to all PACER users in Mr. Fisher's proposed class would not assist in the manageability of this case as a class action, as it did in *Nat'l Veterans*. Ultimately, "[t]he [] question under Rule 23(b)(3) is whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." RCFC 23(b)(3). Mr. Fisher has not established how a class action would provide any discernible advantages over individual lawsuits in light of the highly individualized questions of harm and damages presented by this case.[8]

---

[8] Mr. Fisher asserts that class members in this action would receive small recoveries if they prevailed, which would not incentivize members to bring individual actions. [ECF 94-1] at 19. While the Court agrees that this factor favors class certification, it is far outweighed by the likely difficulties to be encountered in the management of this case as a class action.

### III.  CONCLUSION

Mr. Fisher has failed to satisfy the predominance and superiority requirements under RCFC 23(b)(3). Accordingly, plaintiff's motion for class certification is **DENIED**. The parties shall file a joint status report on or before December 23, 2022, with proposed further proceedings.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge
